## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA MARTINEZ, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. JUNIOR NATIONALS, INC.,<br><br>Defendant. | **CIVIL ACTION NO.**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Patricia Martinez, by and through counsel, on her own behalf and on behalf of all others similarly situated, and hereby brings this action against Defendant U.S. Junior Nationals, Inc. ("Defendant" or "USJN"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

1.      This action poses the question, "why would an amateur sports organization allow a hotel broker to dictate wins and losses in their tournaments?" Absurd though the question may seem, this is exactly what happens in Defendant's illegal and anticompetitive tying arrangements that it literally calls "Stay to Play." In other words, "if you want to play in our tournament, you have to stay where we tell you (and pay whatever we tell you to pay). And if you stay somewhere else, you and your whole team forfeits."

2.      Specifically, this action stems from Defendant's illegal and anticompetitive "Stay to Play" arrangements foisted upon their customers, whereby the largest and most powerful organizer of youth sports tournaments – who is ostensibly primarily interested in promoting youth sports – grants a hotel broker enormous levels of influence and leverage over the participating

families by conditioning participation in the tournament upon staying at hotels designated by the broker.

3.      Families who decline to stay at the designated hotels are met with draconian consequences.  As a threshold matter, the ability to sign up for the tournament at all is predicated upon agreeing to stay at these partner hotels. In some instances, even a single player declining to stay at the hotel can result in forfeiture of games, impacting not just themselves but the other members of the team and their families. Thus, the pressure to simply comply and "Stay to Play" as directed is overwhelming.

4.      Additionally, in some circumstances, a family may be permitted to stay at the accommodations of their choosing, but only after agreeing to pay a penalty of $250 to $1000 to have the privilege of staying where they want to stay, underscoring that at the end of the day, there is no valid business justification for the policy, and it is instead a naked money grab.

5.      Moreover, it is not sufficient to dictate where these families can stay, Defendant also dictates the rate and terms. Once the acceptable hotels are identified, families are **not** able to book directly with those hotels to potentially get a better rate, different room category, or even select the configuration of beds that makes the most sense for their family.  Their sole option is to book through Defendant's Stay to Play program and take whatever is offered.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Patricia Martinez is a citizen of the State of Missouri.  Plaintiff has a child who participates in tournaments organized by Defendant and has paid to stay at Defendant's partner hotels under circumstances when other options were preferable.

7.      Defendant U.S. Junior Nationals, Inc. ("USJN") is a for-profit corporation organized under the laws of Pennsylvania, with its headquarters located at 1950 Street Road, Suite

104, Bensalem, PA 19020.  It can be served via its registered agent located at 55 Sparrow Walk, Newtown, PA 18940.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because at least one Class Member is of diverse citizenship from Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

9.    This Court has personal jurisdiction over Defendant because Defendant's contacts with the State of Pennsylvania are systematic, continuous, and sufficient to subject it to personal jurisdiction in this Court. Specifically, Defendant purposefully availed itself of the privilege of conducting business in the forum state by maintaining its headquarters here and using it as the base of its operations.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant maintains its headquarters in this district, and a substantial part of the events and/or omissions giving rise to Plaintiff's claims emanated from within this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### Market Power

11.    USJN organizes tournaments and hosts them for youth basketball clubs. "Basketball clubs," for the purposes of this litigation, refers to private basketball teams that adolescents and their families pay to be a part of, as distinguished from sports teams that are associated with schools that students can be a part of for free.

12.    USJN holds enormous power within this space, as one of the oldest and largest providers of youth basketball tournaments in the United States, and the largest with a focus upon youth basketball in particular.

13.    For serious youth athletes, tournaments hosted by USJN provide several benefits over other available options for participating in youth basketball events.

14.    First and foremost, the level of competition at USJN events far exceeds that available at school-run events. Basketball clubs are typically comprised of players who would be among the best players on a school team.

15.    As a result, USJN attracts the attention of corporate sponsors. Indeed, USJN has prestigious and influential corporate partners, including Nike, who has been a sponsor since the early 1990's.[1]

16.    Furthermore, because the level of competition is so high, USJN Tournaments are a hotbed of scouting and recruiting activity.  Accordingly, for serious youth athletes who are hoping to use sports as a springboard to college scholarships and related benefits, participating in a USJN Tournament is essentially a necessary part of the process, because participating in traditional school-associated sports do not provide the same level of exposure to college scouts and coaches.

17.    Additionally, however, in many instances, participants have no meaningful choice but to play in a tournament run by USJN because, as a result of its incredible market power, there are no other basketball tournaments available that are practicable to attend, and no readily available substitutes.

18.    Furthermore, individual participants often have no control over which organizational body controls the tournaments in which they participate, because that decision is made by their coaches and club organizers.  Their options are to attend an USJN Tournament, or not attend at all and miss out on the very benefits that come from being a part of a Basketball club.

---

[1] https://www.usjn.com/about_new.php

**Lodging Tying Agreements**

19.    Because most of these tournaments are not local to the participants, securing lodging is often a necessary aspect of any USJN Tournament trip for the teams and their families that participate.

20.    Upon information and belief, USJN has agreements with companies that partner with hotels and secure blocks of rooms for tournament participants to use during tournaments ("Lodging Providers").

21.    Upon information and belief, USJN and Lodging Providers have entered into agreements with one another whereby Lodging Providers will secure rooms for participants of the tournaments offered by USJN.

22.    While the specifics of these agreements is currently unknown, upon information and belief, they include the following critical provisions:

    a.  The Lodging Provider identifies hotels and negotiates a rate for a block of rooms for the participants of USJN's tournaments;

    b.  Those participants are required to stay at these hotels as a condition of participating in the tournaments;

    c.  Commissions are generated from the rooms booked in connection with the tournaments;

    d.  The Lodging Provider and USJN share in or otherwise benefit from the revenue generated by these commissions, either directly or indirectly.

23.    The agreements are great for Defendant, Lodging Providers and their partner hotels, but unduly restrict Plaintiff's and the Class' access to a free and open marketplace for lodging. These agreements artificially create demand for the partner hotels selected by the Lodging

Providers and give Defendant monopolistic power, forcing tournament participants to turn to it and only it for their lodging needs.

<b>How "Stay to Play" Works</b>

24.    "Stay to Play" is a policy developed by Defendant utilizing the agreements discussed above that dictates in no uncertain terms that staying at one of the Lodging Providers' partner hotels is a condition precedent to participating in the USJN Tournament.  To borrow from Defendant's verbiage, if you want to play in the tournament, you have to stay where they tell you to stay.  The two unrelated markets and products – youth basketball tournaments, and hotels – are tied together.

25.    Unspoken but inherent in this arrangement is also that you have to pay what Defendant tells you to pay to stay at these partner hotels, and take whatever rooms are offered. Because, indeed, not only are participants prohibited from staying anywhere else, they are also unable to book at that hotel directly to customize their room, use reward points, book at a lower advertised rate, etc.

26.    There are many reasons participants might want to opt out of using the Lodging Provider's offerings:

   a.    They might have hotel or other reward points that would permit them to stay in the area for free.

   b.    They might need a different bed or room configuration than what is being offered.

   c.    They might be able to find comparable accommodations for less.

   d.    They might be able to find the exact same accommodations at the same hotel for less.

e.  They might prefer to stay somewhere closer to the tournament facility or otherwise more convenient, even if it costs more.

f.  They might prefer to stay somewhere with better amenities.

g.  They might prefer a home rental.

h.  They might not need accommodations at all by virtue of having friends or family in the area, or being close enough that driving in each day is an option.

i.  They might prefer less expensive accommodations.

j.  They might simply prefer to stay elsewhere for reasons of personal preference, brand loyalty, safety, or any of the many other reasons that guide consumer lodging choice.

27.   Stay to Play, however, strips participants of any meaningful choice and foists Defendant's hotel partners upon them.

28.   Defendant punishes participants who do not play along.  Specifically, if participants don't book through the Lodging Provider, even if they stay at the designated hotel, they will not be allowed to play, and their entire team will forfeit their games in the tournament.

**Any Purported Benefits of Defendant's Arrangement Are Pretextual**

29.   Defendant and their Lodging Provider partners trumpet the benefits of Stay to Play for their users, but the reality is that Stay to Play primarily benefits Defendant and their partners.

30.   One of the primary purported benefits of Stay to Play is the ability to secure a block of rooms for participants, but room blocks are negotiated every day in the context of conventions, weddings, etc. that provide the convenience of a designated block of rooms while still preserving consumer flexibility and choice.

7

31.    Additionally, while there *could* be some logistical benefits to having all tournament participants or team members at a single venue, no such benefits are actually realized.  There are several reasons for this:

      a.    Users are not required to stay at a particular hotel, just one of several approved hotels.  Accordingly, there is no guarantee that as a result of this policy, all participants will be staying together.

      b.    Even if they were staying together, neither the partner hotels, USJN, nor the Lodging Providers actually provide any logistical support at the hotel sites. There is no group transportation (participants are still expected to get themselves between the tournament site and the hotel), no tournament representatives on site, no signage or anything else reflecting the hotels' role in the tournament.

      c.    In some cases, the hotels are decidedly <u>in</u>convenient.  Participants were prohibited from obtaining more convenient accommodations, however, by virtue of Defendant's insistence that participants stay at its hotel partners' properties.

32.    Ultimately, any suggestion that Stay to Play is for participants' benefit is undercut by the reality that the circumstances that do allow a participant to stay elsewhere involving <u>paying</u> Defendant.

33.    Specifically, in the limited circumstances where participants are permitted to stay somewhere else, they are required to pay hundreds of dollars for the right to do so.  In Plaintiff's experience, penalties have cost $250-$1000.

34.    If there was truly a tournament-related reason that all participants needed to stay at one of Defendant's chosen hotels, of course, buying Defendant off would not be an option. The

logical conclusion, of course, is that the penalty is Defendant's way of recouping the lost revenue it would have otherwise enjoyed as a result of its monopolistic and anti-competitive practices.

<b>Defendant Profits From Its Anti-competitive Conduct and<br/>Plaintiff and the Class Pay the Price</b>

35.     Upon information and belief, Defendant, Lodging Providers, and their partner hotels all share in the monopoly profits generated by these Agreements.

36.     The partner hotels benefit from guaranteed occupancy at a set and established rate, and the resulting stream of revenue stemming therefrom.

37.     Upon information and belief, commissions, monetary benefits or other revenue are generated by participants staying at the partner hotels, which is then shared by Defendant and its Lodging Partners.

38.     As a direct and proximate result of these Agreements:

   a.   Defendant, who is not in the hotel industry, gets an entirely new stream of revenue associated with hotels used for its tournaments;

   b.   Defendant and its partners enjoy supracompetive profits generated by virtue of the Stay to Play directive;

   c.   Plaintiff and the Class have paid more for accommodations at USJN Tournaments than they otherwise would have, have been denied the opportunity to secure the accommodations of their choosing, and have otherwise been damaged.

<b><u>PLAINTIFF'S SITUATION IS DEMONSTRATIVE</u></b>

39.     Plaintiff Patricia Martinez has a child who has been a participant in USJN Tournaments, which has required travel and the securing of lodging during the duration of the tournaments.  That includes but is not limited to the following USJN Tournament events:

     a.   April 19-21, 2024 – Milwaukee, WI, staying at a Hyatt Place.

     b.   June 1-2, 2024 – Kansas City, MO, staying at a Hampton Inn.

40.     By virtue of having no other option, Plaintiff has paid to stay at the locations dictated by Defendant's Stay to Play policy for these events.

41.     Moreover, when staying at Defendant's selected lodging locations, even if Plaintiff has an existing relationship with the hotel chain selected by Defendant, she is prohibited from contacting the hotel directly to book with points, upgrade a room, extend a stay, or do any of the other things a normal hotel guest would be able to do.

42.     For example, at the Milwaukee event, Plaintiff was given a room that was inappropriate for her needs because of the bed configuration but was unable to make any modifications to the room on account of Defendant's policy.

43.     Similarly, at the Kansas City event, Plaintiff would have preferred to stay somewhere else entirely, and at the hotel selected by Defendant, was given a room that was too small, but was unable to upgrade to a larger room because Defendant's policy prohibited it.

44.     In some instances, Plaintiff has had to opt her child out of tournaments she would have otherwise participated in because of insufficient or inadequate lodging opportunities.

45.     As a direct and proximate result of being compelled to stay where Defendant has commanded her family to stay, Plaintiff has been deprived of the opportunity to secure lodging that meets her needs, has paid more for lodging that she otherwise would have, and has stayed at hotels she would not have otherwise stayed at but for Defendant's policy to ensure that her child could participate in the tournaments and that her team would not forfeit.

## TOLLING AND ESTOPPEL

46.    Defendant's Agreements with its Lodging Providers and hotel partners are non-public, and Plaintiff and the Class did not know and could not have known of the illegal and improper nature of Defendant's Agreements until shortly before the filing of this lawsuit.  Thus, the statute of limitations has been tolled, and Defendant should be estopped from relying upon any statute of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action on her own behalf, and on behalf of a Class of all those similarly situated, defined as follows:

> All persons in the United States who have signed up for a tournament organized by USJN and paid for accommodations as part of a Stay to Play directive by USJN.

> Excluded from the Class are Defendant, as well as Defendant's employees, affiliates, officers, and directors, and the judge and court staff to whom this case is assigned.

48.    **Numerosity**.  The Class is so numerous that joinder of all members is impracticable.  Although the precise number of Class Members is unknown and is within the exclusive control of Defendant, upon information and belief, Defendant's wrongful conduct as described herein impacted hundreds of thousands, if not millions, of people spread throughout the United States.

49.    **Commonality**.  The claims of Plaintiff and the Class involve common questions of fact and law that will predominate over any individual issues.  These common questions include, but are not limited to:

> a.  Whether Defendant's conduct constitutes an improper tying arrangement;

> b.  Whether Defendant's conduct constitutes an improper attempt to monopolize;

c.   Whether Defendant's agreements with Lodging Providers constitute a contract, combination or conspiracy in restraint of trade or commerce;

d.   Whether Defendant's conduct significantly impacts interstate trade and commerce;

e.   The degree of power exerted by Defendant in the market for youth sports tournaments;

f.   Whether Plaintiff and the Class have sustained damages, and the amount of those damages;

g.   Whether equitable relief is appropriate and necessary to ensure a free and competitive market for tournament accommodations;

h.   Whether restitution to Plaintiff and the Class is appropriate and the amount of that restitution; and,

i.   Whether Defendant has been unjustly enriched by its conduct described herein.

50.   **Typicality**.  Plaintiff's claims are typical of the claims of members of the Class. As described herein, Plaintiff and the Class all paid for attendance at a USJN tournament, and were forced to stay at the accommodations of Defendant's choosing and suffered damage thereby. The same evidence that will be needed to prove Plaintiff's claim will likewise be necessary to prove the claims of Class Members. Plaintiff and Class Members have incurred similar losses based on the same legal theories.

51.   **Adequacy**.  Plaintiff will fully and adequately represent and protect the interests of the Class because she shares common interests with Class Members as a result of Defendant's wrongful conduct.  Further, Plaintiff has retained counsel with experience in complex class action litigation, including that involving antitrust issues.  Plaintiff's counsel have successfully prosecuted class actions previously in state and federal courts.

52.    **Predominance**.  Questions of law and fact common to the Class predominate over questions affecting individual members.  Individual damages on the matter can be readily calculated in a formulaic manner based upon easily accessible data maintained by Defendant and/or Class Members.  Therefore, the questions of individual damages will not predominate over legal and factual questions common to the Class.

53.    **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff and Class Members have suffered economic harm as a result of Defendant's unlawful and wrongful conduct, which was directed toward Class Members as a whole rather than specifically or uniquely against any individual Class Members. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

54.    **Declaratory and Equitable Relief.**  Class wide declaratory and equitable relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendant has acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to Defendant's liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.  Class wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendant's discharge of its duties to perform corrective action.

## <u>COUNT I</u>
## RESTRAINT OF TRADE UNDER THE SHERMAN ACT
## (15 U.S.C. § 1)

55.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56.    Plaintiff, Defendant and its Lodging Provider partners constitute "persons" as that term is defined in 15 U.S.C. § 7 and used throughout 15 U.S.C. §§ 1 et seq.

57.     The Agreements at issue are between entities located in different states and impact consumers all over the country, and thus has a substantial impact upon interstate commerce.

58.     Defendant's Agreements unduly restrain trade in several respects:

59.     First, the Agreements constitute illegal tying arrangements, in that Defendant is conditioning the purchase of one product or service – its sports tournaments – with a completely distinct product or service – hotel rooms purchased through Defendant's designated Lodging Providers.

60.     Defendant essentially leverages the demand for its sports tournaments that exits by virtue of its overwhelming, dominant market position, and uses that to steer tournament participants to its Lodging Partners, who would otherwise be able to select accommodations on the open market.

61.     Defendant's Agreements also restrain free trade more generally, in that it unduly limits consumer choice without sufficient jurisdiction.

62.     Defendant's Agreements as described herein thus constitute a contract, combination or conspiracy in restraint of trade or commerce as those terms are used in the Sherman Act, 15 U.S.C. § 1.

63.     As a direct and proximate result of Defendant's conduct as described herein, Plaintiff and the Class have been deprived of the ability to make accommodation choices based upon market factors and their own preferences, and have instead been forced to stay where Defendant tells them, on the terms and at the prices that Defendant and its partners select.

64.     Plaintiff and the Class have been injured by virtue of Defendant's conduct as described in this Count as that language is used in 15 U.S.C. § 15.

<u>**COUNT II**</u>
**MONOPOLIZATION UNDER THE SHERMAN ACT**
**(15 U.S.C. § 2)**

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     Defendant and its Lodging Provider partners constitute "persons" as that term is defined in 15 U.S.C. § 7 and used throughout 15 U.S.C. §§ 1 et seq.

67.     The Agreements at issue are between entities located in different states and impact consumers all over the country, and thus has a substantial impact upon interstate commerce.

68.     Through the implementation of Defendant's "Stay to Play" policy as described herein, Defendant uses its control over high school sports tournaments to exclude competition among accommodation providers or to gain control over the market for tournament-related hotel bookings.

69.     Instead, Defendant is attempting to create, and has in fact created, a monopoly in the market for accommodations for its tournament participants.

70.     Rather than permitting participants to select accommodations that meet their specific needs, Defendant requires every participant to stay at the limited collection of hotels that financially benefit it.

71.     Defendant's Agreements as described herein constitute an attempt to monopolize trade or commerce in the travel market for tournament participants in as those terms are used in the Sherman Act, 15 U.S.C. § 2.

72.     As a direct and proximate result of Defendant's conduct as described herein, Plaintiff and the Class have been deprived of the ability to make accommodation choices based upon market factors and their own preferences, and have instead been forced to stay where Defendant tells them, on the terms and at the prices that Defendant and its partners select.

73.     Plaintiff and the Class are persons who have been injured by virtue of Defendant's conduct as described in this Count as that language is used in 15 U.S.C. § 15.

## COUNT III
## PENNSYLVANIA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (73 Pa. Stat. Ann. § 201-1)

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.     Plaintiff and Defendant are "persons" as that term is used in 73 Pa. Stat. Ann. § 201-2(2).

76.     Defendant is engaged in "trade" and "commerce" as that term is used in 73 Pa. Stat. Ann. § 201-2(3) in that it is offering services, intangible property, and/or other things of value for sale, which directly and/or indirectly affects the people of the Commonwealth of Pennsylvania.

77.     Defendant's conduct as described herein constitutes an unfair method of competition in that it is representing that its services have an affiliation or connection it does not have as described in 73 Pa. Stat. Ann. § 201-2(4)(v).

78.     Defendant's conduct as described herein constitutes an unfair method of competition in that it is "fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding" as described in 73 Pa. Stat. Ann. § 201-2(4)(xxi).

79.     As a direct and proximate result of Defendant's conduct described herein, Plaintiff and the members of the class have sustained damages in an amount to be proven at trial.  Thus, Plaintiff and the members of the class constitute persons who purchased goods or services primarily for personal, family or household purposes and thereby suffered an ascertainable loss of money as a result of the employment of the improper practices described herein as described in 73 Pa. Stat. Ann. § 201-9.2.

## <u>COUNT IV</u>
## <u>UNJUST ENRICHMENT</u>

80.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

81.     By staying at and paying money to the hotels directed by Defendant, Plaintiff and the Class are providing a benefit to Defendant in the form of commission or other revenue associated with the booking.

82.     For the reasons set forth herein, it would be unjust for Defendant to retain said monetary benefit.

83.     Defendant's retention of said benefit is to the detriment of Plaintiff and the Class.

84.     Where, as here, Defendant's retention of Plaintiff and the Class's money is based upon an illegal, unfair, and/or an illegal purported tying agreement, it would be unjust and inequitable to permit Defendant to retain said funds.

85.     A constructive trust should be created for the benefit of Plaintiff and the Class representing the collective value of the benefit provided to Defendant.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action pursuant to the proposed Class definition, and respectfully requests that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined herein;

B.     Appoint Plaintiff as the representative of the Class and her counsel as Class counsel;

C.     Award damages, including compensatory and treble damages, to Plaintiff and all other Class Members;

D.    Award Plaintiff and Class Members such additional damages, over and above the amount of their actual damages, which are authorized and warranted by law;

E.    Grant equitable relief preventing Defendant from implementing its Stay to Play policy or any like policy that similarly restricts free and fair competition in the temporary accommodation market for tournament participants;

F.    Award restitution to Plaintiff and Class Members and require Defendant to disgorge inequitable gains;

G.    Create a constructive trust for the benefit of Class Members comprising all inequitably obtained monies and/or proceeds derived therefrom;

H.    Award Plaintiff and Class Members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and,

I.    Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: February 18, 2025                    Respectfully submitted,

*/s/ Steven A. Schwartz*
Steven A. Schwartz (Bar ID No. 50579)
Kimberly M. Donaldson Smith (Bar ID No. 84116)
Alex M. Kashurba (Bar ID No. 319003)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
361 Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 645-4720
sas@chimicles.com
kds@chimicles.com
amk@chimicles.com

James J. Rosemergy
jrosemergy@careydanis.com
**CAREY, DANIS & LOWE**
8235 Forsyth, Suite 1100
St. Louis, MO 63105
Telephone: (314) 725-7700
jrosemergy@careydanis.com

*Attorneys for Plaintiff*