**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**PATRICIA MARTINEZ,** ***on her own behalf and on behalf of all others similarly situated***
*Plaintiff,*

**v.**

**U.S. JUNIOR NATIONALS, INC.,**
*Defendant.*

**Civil No. 25-851**

**MEMORANDUM**

**Costello, J.** **August 26, 2026**

Plaintiff Patricia Martinez brings this putative class action against Defendant U.S. Junior Nationals, Inc. (USJN) under the Sherman Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), and Pennsylvania common law. She challenges Defendant's "Stay to Play" policy, which requires participants in Defendant's elite youth basketball tournaments to book hotel rooms with select lodging providers using Defendant's booking website. Defendant has moved to dismiss Plaintiff's First Amended Complaint ("FAC") for failure to state a claim. For the reasons that follow, the Court will grant the motion with leave to amend.

## I. FACTUAL & PROCEDURAL BACKGROUND

Defendant USJN hosts and organizes elite-level tournaments ("Elite Youth Exposure Tournaments") for girls' youth basketball club teams. ECF No. 15 ¶ 16. Club teams are private teams that participants pay to join. *Id.* ¶ 11. The athletes on these club teams are typically "among the best players on a school team." *Id.* ¶ 13. Plaintiff is the parent of a child whose club team has participated in Defendant's basketball tournaments. *Id.* ¶ 6.

Defendant's elite-level tournaments differ from other youth basketball tournaments because of the high caliber of the attending athletes, the attendance of college coaches and scouts, and the reputation of these tournaments as "a pathway for collegiate athletic scholarships." *Id.* ¶ 16. The level of competition at Defendant's tournaments far exceeds that of school-run events and has attracted corporate sponsors. *Id.* ¶¶ 13-15. Athletes and their families travel from across the country to participate in Defendant's tournaments, which take place in various states. *Id.* ¶ 17.

In connection with its tournaments, Defendant maintains a policy known as "Stay to Play." *Id.* ¶ 2. Under this policy, Defendant's tournament participants must book hotel rooms with select hotel brands or lodging providers. *Id.* ¶¶ 22, 27, 30. Participants cannot pick different lodgings. *Id.* ¶ 35(c). Participants also cannot book directly with the selected lodging provider or use loyalty points or corporate discounts to obtain lower rates. *Id.* ¶¶ 5, 28, 47. Participants must take whatever room is provided and pay whatever price is offered, "often at supracompetitive prices or with restrictions not found in the open market." *Id.* ¶ 28. In some instances, if a participant does not comply with Stay to Play, their team forfeits the tournament. *Id.* ¶ 3. Occasionally, Defendant permits a family to stay elsewhere, but only after the team pays a penalty ranging from $250 to $1,000. *Id.* ¶¶ 4, 30.

Plaintiff's child has participated in at least two of Defendant's events and stayed at Defendant's select hotels. *Id.* ¶ 44-45. If not for Stay to Play, Plaintiff would have chosen different accommodations or applied her corporate discounts for a lower price. *Id.* ¶ 45. At times, Plaintiff has opted her child out of Defendant's tournaments due to inadequate lodging choices. *Id.* ¶ 49. As a result of Stay to Play, Plaintiff has "been deprived of the opportunity to

secure lodging that meets her needs" and has overpaid for lodging so her child and her team could participate in the tournaments. *Id.* ¶ 50.

## II. LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads facts sufficient to support a reasonable inference "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When reviewing a 12(b)(6) motion, a court can consider the complaint as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

### A. Restraint on Trade

Plaintiff alleges that the Stay to Play policy represents an unlawful restraint of trade. Section 1 of the Sherman Act makes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" illegal. 15 U.S.C. § 1. A plaintiff bringing a § 1 claim must prove two "essential requirements:" (1) an agreement; and (2) an "unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).

"An agreement may be shown by either direct or circumstantial evidence." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018). At the pleading stage, allegations

of parallel conduct must suggest a "'preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). To show circumstantial evidence of agreement, a plaintiff must allege parallel conduct and "something more," such as a "a motive to enter into a conspiracy" or "that the defendant acted contrary to its interests." *Highmark*, 902 F.3d at 333 (internal quotation marks omitted).

According to Plaintiff, Defendant has an agreement with its lodging partners whereby the lodging provider identifies hotels and negotiates hotel blocks and Defendant requires tournament participants to stay at these hotels, generating commissions shared by Defendant and its lodging partners. *Id.* ¶ 25(a)-(d). This is likely sufficient to plead parallel conduct. Plaintiff provides examples of Stay to Play's enforcement, specifically monetary penalties and forfeiture from the tournament. *Id.* ¶ 30(a)-(d). Additionally, her claims that Stay to Play results in higher prices and generates additional revenue for Defendant and its lodging partners establishes a financial motive to enter a conspiracy. ECF No. 15 ¶ 43; *Highmark*, 902 F.3d at 333. Therefore, at this stage, Plaintiff has raised the suggestion of an agreement between Defendant and its lodging provider partners.

To survive dismissal, Plaintiff must also plausibly allege an unreasonable restraint on trade. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315. Plaintiff alleges that Stay to Play unduly restrains trade through (1) a tying arrangement between Defendant's tournaments and "lodging services;" and (2) "more generally" by limiting consumer choice with no significant justification or benefit. *Id.* ¶¶ 27, 67.

1. Tying

"In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product." *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 200 (3d Cir. 1994). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Here, the alleged tying product is Defendant's elite youth exposure tournaments, and the tied product is the hotel accommodations provided by Defendant's lodging partners. To succeed on a tying claim under § 1 of the Sherman Act, the plaintiff must show (1) the defendant has sufficient market power over the tying product; (2) the tie has affected "a substantial amount of interstate commerce;" and (3) the plaintiff has suffered antitrust injury. *Allen-Myland*, 33 F.3d at 201 (internal citations omitted).

Tying is a *per se* unreasonable restraint on trade, meaning "the probability that the [tying agreement] improperly restrains trade is so high that a judicial inquiry into the actual prevailing market conditions . . . is deemed unprofitable." *Allen-Myland*, 33 F.3d at 201. Accordingly, unlike other § 1 claims, a plaintiff who succeeds on a *per se* tying claim need not provide "further proof of anticompetitive effect" or rebut any procompetitive justifications for the tie. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992).

*i. Market Definition*

The first inquiry in a tying case, whether the Defendant has sufficient market power, "requires a finding that two separate product markets exist and a determination of precisely what

[they] are." *Allen-Myland*, 33 F.3d at 200.[1] A plaintiff must define the relevant tying market with reference to "the rule of reasonable interchangeability and cross-elasticity of demand" between the product and its substitutes. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). If the plaintiff fails to do so, or if the alleged market "clearly does not encompass all interchangeable substitute products," the Court may grant a motion to dismiss. *Id.*

"'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference . . . either would work effectively." *Allen-Myland*, 33 F.3d at 206; *see also Chrysler*, 959 F.2d at 479-80 (holding that the relevant market was all new cars sold in the United States because Chrysler cars were reasonably interchangeable with other cars). Cross-elasticity of demand examines whether "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). "[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza*, 124 F.3d at 436 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992)). Plaintiff identifies Defendant's tying market as "elite-level youth basketball tournaments that provide significant exposure opportunities to college scouts and recruiters, particularly for female athletes ('Elite Youth Exposure Tournaments')." ECF No. 15 ¶ 16. Plaintiff alleges that Elite Youth Exposure Tournaments differ from other youth basketball tournaments because of the high caliber of the attending athletes, the attendance of college coaches and scouts, and the reputation

[1] Defendant challenges Plaintiff's market definitions but does not contest that tournaments and hotels are distinct products. *See generally* ECF No. 17-1 at 10-15.

of these tournaments as "a pathway for collegiate athletic scholarships." ECF No. 15 ¶ 16. Plaintiff thus articulates shared characteristics that place elite youth exposure tournaments into one product market. The alleged superiority of Defendant's tournaments indicates "differentiation . . . among competing products in the same market" rather than a lack of interchangeability. *Highmark*, 902 F.3d at 339. Moreover, drawing all inferences in Plaintiff's favor, girls' basketball teams are unlikely to find elite girls' basketball tournaments interchangeable with tournaments for boys or for girls who play another sport.[2] Plaintiff has made sufficient reference to interchangeability.

Plaintiff does not explicitly reference cross-elasticity of demand. However, her distinctions between elite youth exposure tournaments and other athletic programs plausibly explain that a change in the price of the former would not necessarily cause buyers to seek out the latter due to their unique level of competition and exposure to college scouts. Given that "courts hesitate to grant motions to dismiss for failure to plead a relevant product market,"[3] Plaintiff's product market definition suffices at this stage.

Plaintiff's geographic market also suffices. Plaintiff defines the geographic market as "national" because athletes travel across the country to play in Defendant's tournaments, seeking "maximum exposure" to scouting and elite competition. ECF No. 15 ¶ 17. The FAC thus pleads the "commercial realit[y]" that multiple states could serve as potential tournament venues.

---

[2] *C.f. Highmark*, 902 F.3d at 339 (suggesting that medical sellers offer a limited number of products and cannot easily change their offerings to induce a disinterested buyer to purchase their product). Like *Highmark*, Plaintiff's allegations suggest that vendors of elite girls' youth basketball tournaments likely cannot easily change the type of sport or gender division to attract otherwise disinterested consumers.

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001), *cited in Highmark*, 902 F.3d at 337.

*Highmark*, 902 F.3d at 337. Therefore, Plaintiff has plausibly alleged that teams and athletes would "rationally look" for tournaments nationally. *Tunis Bros.*, 952 F.2d at 726 (internal quotation marks omitted). At this stage, Plaintiff sufficiently defines the tying market.

*ii. Market Power*

For tying purposes, market power is "the ability 'to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.'" *Allen-Myland*, 33 F.3d at 200 (quoting *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620, (1977)). If the seller lacks power in the tying market, buyers "will simply avoid the tie by buying the tying product from another supplier." *Id.* Accordingly, a tying arrangement is only unlawful when a seller has sufficient market power to impair competition in the tied market and "force a purchaser to do something that [they] would not do in a competitive market." *Hyde*, 466 U.S. at 14 (1984) (holding that plaintiff failed to establish market power where only 30% of patients in geographic region chose defendant's hospital).

Ordinarily, courts infer market power where the seller has a "predominant share" of the tying market. *Eastman Kodak*, 504 U.S. at 464. However, courts may consider additional factors such as current ease of entry into the market, which would dilute a seller's market power. *Allen-Myland*, 33 F.3d at 209-10. "Barriers to entry" into the market may include "legal licenses; control over a superior resource; entrenched buyer preferences; . . . costs and delays of the regulatory process; . . . large capital requirements; access to technical information, and disparities in risk." *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 649 (E.D. Pa. 1997) (citations omitted).[4]

---

[4] This case involved a monopolization claim, but both monopolization and *per se* tying claims require plaintiffs to allege market power. *Yeager's Fuel,* 953 F. Supp. at 658 ("[M]arket and monopoly power differ only in degree." (internal quotation marks omitted)).

Defendant argues that Plaintiff's tying claim should be dismissed because, *inter alia*, the FAC fails to allege that Defendant possesses market power.[5] ECF No. 17-1 at 10-17. Plaintiff counters that the Court need not inquire into Defendant's market power, or alternatively, that she has sufficiently alleged market power. ECF No. 18 at 7-20.

Plaintiff must sufficiently allege market power to state a claim for unlawful tying. *See, e.g.*, *Hyde*, 466 U.S. at 14 (1984). Plaintiff alleges that Defendant has "significant market power" based on its status as "one of the oldest and largest providers of youth basketball tournaments in the United States;" its "long-standing presence and brand recognition;" its "scale, history, and established relationships with college coaching networks;" and "significant barriers to entry." ECF No. 15 ¶ 18.

Market Share: Plaintiff does not estimate the percent of the market Defendant controls or the number of potential competitors in the market. Instead, she alleges that Defendant controls a "substantial share" of the market without further explanation. *Id.* This conclusory statement fails to sufficiently allege Defendant's market share. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.").

Barriers to entry: Plaintiff identifies "barriers to entry" including "substantial upfront investment," difficulty "securing commitments from a critical mass of elite teams," and "attracting a comparable contingent of college scouts." ECF No. 15 ¶ 18(c). However, Plaintiff

---

[5] Defendant also argues that Plaintiff's antitrust claims should be dismissed because (1) Plaintiff has not suffered an antitrust injury; (2) Plaintiff lacks standing to pursue injunctive relief; and (3) Plaintiff is an indirect purchaser, barring her from bringing antitrust damages claims. ECF No. 17-1 at 8-19. Because the Court will dismiss Plaintiff's claims on other grounds, it does not reach these issues. Nor does the Court decide whether Plaintiff has pleaded that the alleged tie affects a "substantial" amount of interstate commerce.

does not explain why substantial upfront investment is required or estimate the kind or degree of requisite investment. Instead, she relies on conclusory language without specific factual support. Plaintiff also does not plead facts explaining how attracting college scouts or "securing commitments" from elite teams pose barriers to entry. Even taking all factual allegations as true, Plaintiff labels her allegations as "barriers to entry" and asks the Court to accept a speculative chain of premises about the relevant market. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that a plaintiff must allege more than "labels and conclusions," and factual allegations must "raise a right to relief above the speculative level"). Finally, Plaintiff does not identify any regulatory hurdles, technical knowledge, or disparities in risk that could pose barriers to entry. *See Yeager's Fuel*, 953 F. Supp. at 649.

Direct evidence:[6] Plaintiff alleges that Defendant's ability to impose Stay to Play is "direct evidence of its market power" because in a truly competitive market, athletes would choose alternative tournament providers and reject Stay to Play. ECF No. 15 ¶ 18(d). In alleging that a restraint of trade itself is evidence of market power, Plaintiff merely recites the legal elements of her claim without "further factual enhancement." *Iqbal*, 556 U.S. at 678. Plaintiff's allegation that Defendant's outsized market power "constrain[s]" consumer choice is similarly circular. ECF No. 15 ¶ 20. Finally, Plaintiff argues that she sufficiently alleges "a 'conditioned' sale and unlawful 'forcing'" as "direct evidence of market power." ECF No. 18 at 18. Here, Plaintiff merely restates the elements of tying. *See Hyde*, 466 U.S. at 12. Labeling tying as itself evidence of market power rests on legal conclusions that the Court need not credit at this stage.

[6] "Direct evidence" of market power often arises in the context of monopolization, *see infra* Sec. III(B), but the Court will liberally construe Plaintiff's allegations of "direct evidence" as further support for her § 1 claim.

Absence of demand-side substitutability: Plaintiff puts forth the conclusory allegation that competitor tournaments "do not provide a comparable level of nationwide competition, organization, and, crucially, consistent access to . . . a broad array of college scouts and recruiters." ECF No. 15 ¶ 18(b). She further alleges that competitors "lack the scale, history, and established relationships with college coaching networks that USJN has cultivated." *Id.* Plaintiff does not provide factual support for these conclusions. Similarly, she does not allege facts to support her vague suggestions of "scale," "brand recognition," and "history." *C.f. Chrysler*, 959 F.2d at 480 ("[A] prestigious trademark is not itself persuasive evidence of economic power." (internal quotation marks omitted)) (discussing relevant market). Therefore, the FAC does not plausibly allege that competitors are prevented from offering elite youth exposure tournaments of a similar caliber. While the alleged superiority of Defendant's tournaments was not fatal to her market definition, these same allegations do not plausibly allege the absence of demand-side substitutability. Ultimately, the FAC fails to explain why consumers could not simply avoid the tie by choosing a different elite youth exposure tournament.[7] Because Plaintiff does not sufficiently allege that Defendant possesses market power, the Court will dismiss her tying claim.

2. Restraint of Trade "More Generally"

In the alternative to her tying claim, Plaintiff alleges that Defendant's agreements with lodging providers "also restrain free trade more generally; in that it unduly limits consumer

[7] Defendant notes that other elite youth exposure tournaments impose Stay to Play. ECF 17-1 at 15-16. Setting aside issues of judicial notice, Plaintiff does not make this allegation in her FAC, nor does she explain with specificity whether Defendant's Stay to Play policy is uniquely anticompetitive or similar to that of competitor tournaments. *See Boyce v. Nationwide Mut. Ins. Co.*, 842 F. Supp. 822, 823 (E.D. Pa. 1994) ("A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint.").

choice without sufficient justification or consumer benefit." ECF No. 15 ¶ 67. Plaintiff does not specify how the agreements operate to limit consumer choice apart from her tying allegations. Her Opposition provides little guidance, stating only that she has shown "direct evidence of anticompetitive effects" without pointing the Court to any specific facts in the FAC aside from her market power allegations. ECF No. 18 at 17. The Court is skeptical that this broad allegation should "unlock the doors of discovery." *See Iqbal*, 556 U.S. at 678 (explaining that a plaintiff cannot "plead the bare elements of [her] cause of action, affix the label 'general allegation,' and expect [her] complaint to survive a motion to dismiss"). Nonetheless, drawing all factual inferences in Plaintiff's favor, the Court will evaluate whether the facts underlying her tying claim plausibly allege a "more general" restraint on trade.

If a plaintiff cannot establish a *per se* antitrust violation such as tying, courts will apply the "rule of reason" to determine whether a practice unreasonably restrains trade. Under this default standard, the plaintiff must show that the challenged tying agreement "produced an adverse, anticompetitive effect within the relevant geographic market," and a court must then decide whether any "countervailing pro-competitive benefits" justify the adverse effect. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315-16. Plaintiffs can make this showing through direct or indirect evidence of anticompetitive effects. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Direct evidence is "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (internal quotation marks omitted). Indirect evidence constitutes "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* Because market power is a "surrogate for detrimental effects," either option meets the plaintiff's burden. *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (internal citation omitted). However, because

Plaintiff does not sufficiently allege market power, the Court will evaluate whether Plaintiff has pleaded actual detrimental effects.

Plaintiff alleges detrimental effects of Stay to Play, such as depriving the class of the ability to choose lodging based on market factors or their own preferences, forcing them to accept less desirable lodging, creating artificial demand for Defendant's partner hotels, and increasing the class's costs for accommodations and transportation from the hotels' inconvenient locations. ECF No. 15 ¶¶ 26, 28, 43, 69.

While Plaintiff alleges that Stay to Play restricts consumer choice and increases costs in the tying market, she falls short of pleading sufficiently specific "actual detrimental effects on competition." *Am. Express Co.*, 585 U.S. at 542 (cleaned up). Plaintiff claims that Defendant's anticompetitive conduct leads to supracompetitive pricing and inadequate lodging without explaining how those results occur. Plaintiff is missing a factual link between the alleged anticompetitive conduct and detrimental effects. *See Twombly*, 550 U.S. at 545 (explaining that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must allege "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."). Additionally, Plaintiff does not specify the unlawful restraint on trade, relying on the conclusory suggestion that Stay to Play "unduly limits consumer choice without sufficient justification or consumer benefit." ECF No. 15 ¶ 67. *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010) ("It is an axiom of antitrust law . . . that merely saying so does not make it so for pleading-sufficiency purposes.").

Accordingly, Plaintiff does not sufficiently allege facts to support (1) market power with respect to her tying claim; or (2) actual detrimental effects with respect to her "more general" restraint of trade claim. Therefore, the Court will grant Defendant's motion as to Count I.

**B. Monopolization**

1. Monopoly Power

Defendant argues that Plaintiff fails to allege monopoly power. ECF No. 17-1 at 10-15. Monopolization under § 2 of the Sherman Act has two elements: (1) a seller's monopoly power in the relevant market; and (2) "willful acquisition or maintenance" of that power rather than growth or development from a "superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). "Monopoly power is the ability to control prices and exclude competition in a given market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (internal citation omitted). A seller has monopoly power if it can "profitably raise prices without causing competing firms to expand output and drive down prices." *Id.*

A plaintiff can prove monopoly power through "direct evidence of supracompetitive prices and restricted output" or indirect evidence (*i.e.*, an "inference") based on "the structure and composition of the relevant market." *Id.* (internal citations omitted). Direct evidence is "rarely available" and requires a showing of defendant's "abnormally high price-cost margin" and "restricted output." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016) (internal quotation marks omitted). To support an inference of monopoly power, a plaintiff must plead that the defendant "has a dominant share in a relevant market, and that significant entry barriers protect that market." *Broadcom*, 501 F.3d at 307 (internal quotation marks omitted). As with market power under § 1, entry barriers that indicate monopoly power

may include "factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Id.*

A plaintiff must plead the relevant market in the same manner as a § 1: with reference to interchangeability and cross-elasticity of demand. *Id.*; *Queen City*, 124 F.3d at 442. However, monopoly power under § 2 requires "something greater" than market power under § 1. *Eastman Kodak*, 504 U.S. at 481. The scope of the market is a fact question and plaintiff's burden to prove. *Mylan Pharms.*, 838 F.3d at 435. Evidence of a defendant's "relative success in the market," without more, fails to allege monopolization. *Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 403-04 (D. Del. 2009).

Plaintiff alleges that through Defendant's outsized power in the market for elite youth exposure tournaments, Defendant is "attempting to create, and has in fact created, a monopoly" over the market for tournament participants' lodging through Stay to Play. ECF No. 15 ¶¶ 75-76. Because she did not plausibly allege that Defendant possessed market power, Plaintiff fails to state a claim for monopolization, which requires "something greater" than market power under § 1. *Eastman Kodak*, 504 U.S. at 481. Moreover, because she failed to plausibly allege "barriers to entry" into the market as to her § 1 claim, her alleged barriers to entry also fail here. Because Plaintiff has not plausibly alleged monopoly power, the Court does not reach the "willful acquisition or maintenance" element of her monopolization claim.

2. <u>Attempted Monopolization</u>

To state a claim for attempted monopolization under § 2, a plaintiff must allege three elements: "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Proof of one element may provide "permissible inferences" of the others. *Broadcom*, 501 F.3d at 318 (internal quotation marks omitted).

Anticompetitive conduct is that which causes a "deleterious effect on competition." *Philadelphia Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018). To satisfy he second element, plaintiffs traditionally must cite "specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize." *Id.* at 341 (internal quotation marks omitted). Courts have inferred specific intent where a defendant's business conduct is "not related to any apparent efficiency." *Id.* (internal quotation marks omitted) (holding that Uber's decision to circumvent regulations for vehicles-for-hire by designing a business model that neither owned vehicles nor employed drivers could not alone demonstrate specific intent; instead, it evinced a "legitimate business aim" to operate more efficiently and acquire a share of the Philadelphia taxi market); *see also Broadcom*, 501 F.3d at 304, 318 (holding that a plaintiff plausibly alleged that demanding higher royalties from cell phone manufacturers who did not use defendant's chipsets and reducing fees for manufacturers who used its chipsets lacked a "legitimate business justification"). However, "a mere intention to prevail over rivals or improve market position" does not prove specific intent. *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984). Similarly, conduct "tending toward the acquisition of monopoly power" does not show specific intent unless it was "not predominantly motivated by legitimate business aims." *Id.* at 260-61.

As to the third element, dangerous probability is a "fact-intensive inquiry" that courts "typically should not resolve . . . at the pleading stage unless it is clear on the face of the complaint that the . . . standard cannot be met as a matter of law." *Broadcom*, 501 F.3d at 318

(internal quotation marks omitted). To determine whether a complaint has alleged dangerous probability, courts can consider factors such as "significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand." *Id.* 318-19 (holding that a complaint sufficiently alleged "dangerous probability" where it described defendant's licensing practices in detail, alleged that the practices foreclosed plaintiff's entry into new market, and explained how defendant exploited monopoly in one market to attempt monopoly in new market by signing deals with 26 cell phone manufacturers).

Assuming without deciding that Plaintiff alleges the first element of attempted monopolization, the FAC falls short of alleging "specific intent to monopolize." The FAC alleges that Defendant's partner hotels are "inconvenient;" Defendant prohibits sharing rooms "for reasons of cost, efficiency, or even camaraderie;" and there is no "tournament-related reason" for Stay to Play because not all athletes stay at the same hotel. ECF No. 15 ¶¶ 35(c), 36, 39. These claims describe the effects of Stay to Play on athletes personally, such as depriving them of "camaraderie." They do not necessarily demonstrate an intent to monopolize. Plaintiff may have believed that her hotel rooms were personally inconvenient or that sharing a room would be more "efficient," but she fails to allege that Stay to Play is unrelated to some business efficiency or legitimate business aim. Instead, Plaintiff offers only the conclusory allegation that the penalties for opting out of Stay to Play serve "no legitimate or justifiable business purpose" and act as a "naked money grab." *Id.* ¶ 4. These conclusory allegations are insufficient. Given that Defendant may need to guarantee a minimum number of paid hotel stays to secure a hotel block and tournament venue, *see* ECF 17-1 at 1, Defendant's penalty could be reasonably viewed as advancing the legitimate business aim of securing a tournament venue rather than imposing a

fine for the sheer purpose of gaining revenue and eliminating competition. Therefore, the FAC falls short of alleging that Defendant's conduct was "not predominantly motivated by legitimate business aims." *Pa. Dental Ass'n*, 745 F.2d at 261 (internal quotation marks omitted).

The FAC also falls short on the "dangerous probability" element. As discussed with respect to her § 1 claim, Plaintiff does not plausibly allege "significant market share" or "barriers to entry" that would create a dangerous probability of monopolization in the tied market. *Broadcom*, 501 F.3d at 318.[8] Instead, Plaintiff makes only conclusory allegations regarding the strength of competition in the lodging market with little factual support. Accordingly, it is clear on the face of the FAC that Plaintiff does not sufficiently allege attempted monopolization. The Court will dismiss Plaintiff's § 2 claims.

**C. UTPCPL**

Defendant seeks to dismiss Plaintiff's UTPCPL claim for failing to specify (1) any deceptive "representation" by Defendant, (2) justifiable reliance on any such representation, or (3) resulting harm. ECF No. 17-1 at 20-21.[9] Plaintiff counters that (1) she alleged that Stay to Play forced her to book surcharged hotel rooms; (2) she justifiably relied on Defendant's deception by complying with Stay to Play under a "misunderstanding of its purpose;" and (3) she

---

[8] The Court does not reach Defendant's accusation that Plaintiff defines the tied market too narrowly in an effort to artificially inflate Defendant's market power. ECF No. 19 at 8-9.

[9] Defendant also faults Plaintiff for failing to allege the traditional elements of common law fraud. ECF No. 17-1 at 20. However, § 201-2(4)(v) of the UPTCPL does *not* require her to do so. First, this provision prohibits fraud *or* deceptive conduct, and Plaintiff need only prove one. *See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 154 (Pa. Super. Ct. 2012). Additionally, unlike common law fraud, § 201-2(4)(v) does *not* require proof of the actor's state of mind, instead imposing strict liability. *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 649 (Pa. 2021). Finally, the UTPCPL is "a separate remedy that cannot be preempted, substituted, or replaced by common-law remedies." *Dwyer v. Ameriprise Fin., Inc.*, 313 A.3d 969, 982 (Pa. 2024).

was harmed by paying for a hotel room she otherwise would not have purchased. ECF No. 18 at 24-27.

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. The statute is "liberally" construed to effectuate its purpose: "even[ing] the bargaining power between consumers and sellers in commercial transactions." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018). To state a UTPCPL claim, a plaintiff must allege that (1) the defendant engaged in a prohibited activity under the UTPCPL; (2) the plaintiff "justifiably relied on the defendant's wrongful conduct or representation;" and (3) "suffered harm as a result of that reliance." *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021) (citing Pennsylvania law) (internal quotation marks omitted). "Harm" denotes "ascertainable loss of money or property." *Id.* (quoting *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 180 (3d Cir. 2015)).

Justifiable reliance requires more than a causal connection between the misrepresentation and the harm. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d Cir. 2008), *as amended* (Nov. 6, 2008). A plaintiff must "go further" and show that they "justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Id.* at 217 n.4, 227 (dismissing a complaint where plaintiff claimed reliance on "a presumption [of] paying prices set by an efficient market" without explaining how defendant induced him to buy its product or how knowledge of an "inefficient" market would have changed his conduct).

The UTPCPL defines over twenty "unfair methods of competition." Plaintiff invokes two. First, § 201-2(4)(v) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a

person has a sponsorship, approval, status, affiliation, or connection that he does not have."[10] Second, § 201-2(4)(xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" ("catchall provision"). "An act or a practice is deceptive or unfair if it has the capacity or tendency to deceive." *Golden Gate*, 194 A.3d at 1023 (internal quotation marks omitted). "Neither the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way." *Id.* (internal quotation marks omitted).

Here, Plaintiff alleges that Defendant engaged in unfair competition by misrepresenting that Stay to Play aims to benefit tournament participants while concealing its revenue-generating purpose and the fact that it results in "inflated prices, restricted choices, and inferior accommodations." ECF No. 15 ¶ 87. She further alleges that Defendant implies it is acting only as a tournament organizer and omits its role as a "travel broker." *Id.* Additionally, she alleges that Defendant has engaged in "fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding" by, *inter alia*, failing to disclose its financial interest in lodging booked through Stay to Play, creating a misunderstanding that compliance with Stay to Play is a "legitimate" condition of tournament participation, and coercing participants into booking hotels through Defendant by threating tournament forfeiture. *Id.* ¶¶ 88-89.

These allegations do not state a claim. First, Plaintiff has alleged that Defendant misrepresents the purpose of Stay to Play without citing a single statement from Defendant touting the policy's benefits. Such vague allegations fail to plausibly allege a misrepresentation under § 201-2(4)(v) or deception under § 201-2(4)(xxi). Even assuming that Defendant's

---

[10] The law defines "persons" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." § 201-2(2). Defendant is a "person" under this definition.

omission of (1) its financial interest in Stay to Play or (2) the policy's consequences for tournament participants constituted deceptive conduct under § 201-2(4)(xxi), Plaintiff has not plausibly alleged justifiable reliance on such conduct. Plaintiff simultaneously alleges both that she was "forced" to book lodging through Defendant's lodging providers in violation of antitrust laws and that she chose to use Defendant's lodging partners because of Defendant's omissions in violation of the UTPCPL. Unfortunately, the logical inconsistency of the FAC defeats the plausibility of her justifiable reliance allegations. If Plaintiff was forced to book lodging through Stay to Play, then Defendant could not have plausibly induced her to choose Defendant's partner hotels. Such conduct by Defendant, while potentially limiting consumer choice, does not fall within the purview of the UTPCPL. Therefore, the Court will dismiss Count III.

**D. Unjust Enrichment**

Defendant moves to dismiss Plaintiff's common law unjust enrichment claim because (1) unjust enrichment cannot "substitute for failed tort [or antitrust] claims;" (2) Defendant provided her with the "exact" service and benefits she expected; and (3) Plaintiff booked a hotel room with "full knowledge" of the layout and price. ECF No. 17-1 at 22-23. Plaintiff counters, *inter alia*, that Stay to Play "extracted a separate benefit [other than tournament fees] through unjust means;" "delivered diminished value;" restricted her choices; and generated undisclosed revenue at her expense. ECF No. 18 at 27-28.

A plaintiff bringing an unjust enrichment claim must show that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted and retained the benefit "under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1102 (Pa. 2018). The "focus is

not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.* The Pennsylvania Supreme Court has also defined unjust enrichment as "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution." *Golden Gate*, 194 A.3d at 1034.

Pennsylvania common law recognizes two basic types of unjust enrichment claims. The first falls under a quasi-contract theory of liability in the absence of a valid contract between parties. *See Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 410 (E.D. Pa. 2016) (citing Pennsylvania law). The second alleges "unlawful or improper conduct established by an underlying claim." *Seidl v. Artsana USA, Inc.*, 643 F. Supp. 3d 521, 534 (E.D. Pa. 2022). If a plaintiff's unjust enrichment claim "relies on her underlying claims," it is a "companion" to those claims and will "rise or fall" with them. *Id.* Therefore, if a court dismisses the underlying claims, it must also dismiss a companion unjust enrichment claim. *Id.*

Accordingly, without quasi-contract liability, a plaintiff cannot bring a standalone unjust enrichment claim. *See In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 n.13 (E.D. Pa. 2010) (declining to recognize "autonomous" unjust enrichment claim without predicate claim of wrongful conduct under state or federal law because awarding restitution would "undermine state legislative policies and an entire body of substantive law" barring recovery); *see also Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 560 (E.D. Pa. 2010) ("[U]njust enrichment is not a substitute for failed tort claims in Pennsylvania.") (citing Pennsylvania law); *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once . . . the

District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.").

Here, Plaintiff's unjust enrichment claim appears to be a companion to her underlying claims. Because the Court dismisses Plaintiff's Sherman Act and UTPCPL claims, it must also dismiss Plaintiff's unjust enrichment claim. However, even if the Court was not compelled to do so, Plaintiff has not properly stated a claim.

Plaintiff alleges that tournament participants conferred a direct monetary benefit upon Defendant by booking hotels through its revenue-generating booking process and that allowing Defendant to retain the benefit would be unjust because it is the "direct fruit" of Defendant's antitrust and UTPCPL violations. *Id.* ¶¶ 93-96. Plaintiff has not alleged facts that would render Defendant's retention of her lodging payments inequitable. Accepting her allegations as true, Plaintiff may have experienced the deleterious effects of anticompetitive conduct, such as restricted choice and supracompetitive pricing. However, Plaintiff falls short of showing that such allegedly unlawful conduct entitled her to the equitable remedy of restitution. Plaintiff also does not allege that her hotel rooms were so inadequate as to justify refunding the cost of Plaintiff's lodging. Even if the rooms did not fully suit her needs, Plaintiff received a tournament and a hotel room in exchange for her payments. *C,f. Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 441 (E.D. Pa. 2007) ("[A] plaintiff seeking to recover expenses incurred must have reasonably expected reimbursement."). Accordingly, Plaintiff fails to allege that Defendant has unjustly retained a benefit that would entitle her to restitution. The Court will dismiss Plaintiff's unjust enrichment claim.

**E. Tolling**

Defendant seeks to limit Plaintiff's antitrust claims to conduct occurring four years prior to the original complaint for Plaintiff's antitrust claims and six years prior for her UTPCPL claims. ECF No. 17-1 at 25. Plaintiff claims that the applicable statute of limitations for her each of her claims "has been tolled" because Plaintiff and the class did not know the full extent of Defendant's agreements with the relevant lodging providers until counsel investigated Defendant's practices before filing this lawsuit. ECF No. 15 ¶ 51. Defendant counters that Plaintiff failed to identify any tolling theory that could apply to her claims, and a "basic internet search" would have revealed the purpose and terms of Stay to Play when Plaintiff's child played in Defendant's tournaments. ECF No. 17-1 at 24-25.

Because the Court is dismissing Plaintiff's claims for failure to state a claim, it does not reach tolling. However, the Court notes that Defendant allegedly subjected Plaintiff to Stay to Play in 2024, which falls well within the statute of limitations for each claim. ECF No. 15 ¶ 44. Accordingly, it is not clear that statute of limitations issues alone would merit dismissal at this time.

**F. Leave to Amend**

Courts have broad discretion to grant leave to amend "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The Federal Rules express "a preference for liberally granting leave to amend" unless "amendment would cause undue delay or prejudice, or . . . amendment would be futile." *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988).

Here, amendment would not be futile. First, Plaintiff could plead more specific allegations of market power. For example, Plaintiff may be able to plausibly allege barriers to entry if tournament vendors must navigate a complex regulatory or permitting system to organize their tournaments or supervise the child participants. Similarly, Plaintiff may be able to provide factual support for her proposition that securing commitments from club teams and college scouts are barriers to entry. Plaintiff could also plead facts to approximate Defendant's share of the market. Alternatively, Plaintiff could specify how Defendant's practices restrain trade apart from tying and plead facts suggesting proof of actual detrimental effects on competition.

As for Plaintiff's attempted monopolization claim, Plaintiff could plead facts specifying why Stay to Play is not related to any business efficiency or legitimate business aim. Plausibly alleging market power would further support Plaintiff's § 2 claim. The Court did not reach antitrust standing for injunctive relief, but Plaintiff may wish to provide facts evincing a likelihood of future harm.

To support her UTPCPL claim, Plaintiff may be able to plead a misrepresentation by quoting Defendant's statements that tout the benefits of Stay to Play and plead justifiable reliance by explaining how Defendant induces, rather than forces, consumers into choosing to participate in its tournaments and comply with Stay to Play. Finally, to support her claim for unjust enrichment, Plaintiff could provide facts that plausibly allege it would be unjust for Defendant to retain any revenue generated from its tournaments or Stay to Play.

## IV. CONCLUSION

The Court will grant Defendant's motion to dismiss with leave to amend. An appropriate Order will follow.

**BY THE COURT:**

MARY KAY COSTELLO
United States District Judge